**TOWN OF BALL, et al.,
Plaintiffs-Appellants,**

v.

**RAPIDES PARISH POLICE JURY, et
al., Defendants-Appellees.**

No. 82–4365.

United States Court of Appeals,
Fifth Circuit.

Nov. 19, 1984.

Watson, Murchison, Crews, Arthur & Corkern, William P. Crews, Jr., R. Raymond Arthur, Natchitoches, La., for plaintiffs-appellants.

Howard B. Gist, Jr., Howard B. Gist, III, Alexandria, La., for City of Alexandria.

Gary Partney, Alexandria, La., for Town of Glenmora and Forest Hill.

Edwin O. Ware, III, Dist. Atty., Gus Voltz, Jr., Alexandria, La., for Rapides Parish Police Jury, Rapides Parish School Board & Town of Cheneyville.

Downs & Downs, James Crawford Downs, Alexandria, La., for Town of Boyce.

Before BROWN, REAVLEY and RANDALL, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The appellants[1] before the Court today[2] are the third largest and fastest

---

1. One question not raised by the Parish, but which we must also decide, concerns the standing of the appellants to bring this suit.

The Supreme Court has stated, "Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator." *Coleman v. Miller,* 307 U.S. 433, 441, 59 S.Ct. 972, 976, 83 L.Ed. 1385 (1939). *See also Williams v. Mayor of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933); *City of Trenton v. New Jersey,* 262 U.S. 182, 188, 43 S.Ct. 534, 537, 67 L.Ed. 937 (1923); *Hunter v. City of Pittsburg,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907); *Appling County v. Municipal Elec. Auth.,* 621 F.2d 1301, 1307-08 (5th Cir.), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980); *City of Safety Harbor v. Birchfield,* 529 F.2d 1251, 1253 (5th Cir.1976); *City of New York v. Richardson,* 473 F.2d 923, 929 (2d Cir.), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 182 (2d ed. 1973). *But see City of S. Lake Tahoe v. California Tahoe Regional Planning Agency,* 449 U.S. 1039, 1042, 101 S.Ct. 619, 621, 66 L.Ed.2d 502 (1980) ("Such a *per se* rule [that a political subdivision of a State may not raise constitutional objections to the validity of a state statute] is inconsistent with [*Board of Educ. v.*] *Allen* [392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (challenge to state statute requiring local public school authorities to lend textbooks to parochial school students)], in which one of the appellants was a local board of education.") (White, J., dissenting from denial of certiorari). *Cf. Rogers v. Brockette,* 588 F.2d 1057 (5th Cir.) (municipal corporation claiming that a state statute interferes with the exercise of a congressionally conferred power has standing to sue state), *cert. denied,* 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979). That rule applies even where the defendant is another subdivision of the state, *Village of Arlington Heights v. Regional Transp. Auth.,* 653 F.2d 1149, 1153 (7th Cir. 1981); *City of S. Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d 231, 233 (9th Cir.) (*citing New Orleans v. New Orleans Water Works Co.,* 142 U.S. 79, 12 S.Ct. 142, 35 L.Ed. 943 (1891)), *cert. denied,* 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980), as is the Parish. Thus, the Town of Ball has no standing to assert that the Parish's allocation formula for the tax avails contravenes the Fourteenth Amendment.

However, the several residents of the Town who are appellants here suffer no similar disability to their standing to challenge the distribution scheme. They claim that their rights to equal protection have been infringed because for the past dozen years since Ball became incorporated they have been denied the direct control over and the relatively greater sales tax revenues accorded to citizens of all other incorporated Parish cities. *See infra,* n. 43. They thus allege "a distinct and palpable injury" to themselves, *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *accord Valley Forge Christian Church v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 476, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), which fairly can be traced to the challenged distribution scheme of the Parish and which is likely to be redressed by the exercise of the Court's remedial powers. *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976); *accord Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). This satisfies the art. III standing requirement of alleging "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of [the] issues." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *accord Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57

growing city in Rapides Parish, Louisiana and several of its residents. They complain that each of the incorporated municipalities in the Parish, from the smallest village to the largest city, receives a share of the revenues generated from a parish-wide sales tax—each, that is, except the Town of Ball. The citizens of Ball pay the tax like citizens of the other municipalities. The Town, however, gets no individual share of the resulting funds. Although, as we explain in some detail, the citizens of Ball suffer what would otherwise be regarded as inequitable discrimination we affirm denial of relief by a Federal Court. Applying a rational relationship test we find no basis for the claim of denial of the equal protection of the laws.

### The Parish's Plan

Since 1957 Louisiana has allowed certain of its parishes to levy and collect through their governing bodies a 1% tax on the retail sale and use of tangible personal property and upon the sale of services in the parish.[3] The Rapides Parish Police Jury, as the governing body of Rapides Parish, proposed such a sales and use tax for that parish in 1967. The proposal specified the precise percentage distribution of the resulting tax revenues among the Parish Police Jury, the Parish School Board, and, importantly, each of the nine municipalities then incorporated in the Parish.[4]

---

L.Ed.2d 595 (1978); *KVUE, Inc. v. Austin Broadcasting Corp.*, 709 F.2d 922, 928 (5th Cir.1983); *O'Hair v. White*, 675 F.2d 680, 686 (5th Cir.1982) (en banc).

Further, their allegation satisfies the non-constitutional "prudential" requirements of standing: their asserted injuries are peculiar to them as part of a discrete group of injured Parish residents, *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); *O'Hair v. White*, 675 F.2d 680, 687 (5th Cir.1982) (en banc); and the legal interests which they assert are their own, not those of third parties. *Id.*; *Rogers v. Brockette*, 588 F.2d 1057, 1060 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979). The residents of Ball are proper parties to bring this lawsuit. We would point out that these residents were not aggrieved by the Parish distribution scheme until 1979, when the Town was incorporated and, of course, long after any remedy could be had in the state courts.

2. This is the second appeal of this suit before this Court. In *Town of Ball v. Rapides Parish Police Jury*, 427 F.Supp. 294 (W.D.La.1977), the District Court dismissed the challenge to the tax scheme as precluded by the Tax Injunction Act of 1937, 28 U.S.C. § 1341. This Court reversed, at 597 F.2d 43 (5th Cir.1979). We held that there was no plain, speedy and efficient remedy in the Louisiana courts, because Ball had been incorporated long after the 60-day state prescriptive period for challenges to the scheme had run.

> Taxwise, the town is a forlorn, illegitimate child of the state law under which it was created: it may neither share in the special Parish sales tax revenues which its citizens are required to pay nor fight for a portion of those revenues in the state courts.

*Id.* at 46. *Cf. Levy v. Parker*, 346 F.Supp. 897, 904 (E.D.La.1972) (§ 1341 does not bar a suit that does not seek to enjoin the collection of taxes but that challenges only the unequal distribution of state funds), *aff'd*, 411 U.S. 978, 93 S.Ct. 2266, 36 L.Ed.2d 955 (1973).

On remand, the District Court determined the matter on its merits. This is an appeal from that determination.

3. *See* La.Rev.Stat.Ann. §§ 33:2721–34 (West 1966 & Supp.1984).

4. The disbursement and use provisions of the referendum proposal are now set out in the Rapides Parish Code, Taxation and Licenses § 23–205–07. The tax revenues are distributed under the following schedule:

| Political Subdivision | Percentage of Fund to Which Entitled |
|---|---|
| 1. Parish Police Jury | 9.0 |
| 2. Parish School Board | 50.0 |
| 3. City of Alexandria | 33.0 |
| 4. City of Pineville | 5.0 |
| 5. Town of Lecompte | .7497 |
| 6. Town of Glenmora | .7302 |
| 7. Town of Boyce | .5520 |

Further, the proposition detailed the permissible uses of the revenue.[5]  On September 19, 1967, the proposal was approved in a referendum by a majority of the voting citizens of the Parish.

Ball, as an incorporated Louisiana municipality, came into existence some five years later by proclamation of the Governor [6] in June 1972.  The tax distribution plan, however, was not drafted to account for a newly-incorporated municipality.[7]  Consequently, for now over a decade every incorporated city in the Parish has been directly receiving a portion of the Parish tax revenues except the Town of Ball.[8]  The citi-

| Political Subdivision | Percentage of Fund to Which Entitled |
|---|---|
| 8.  Town of Cheneyville | .5232 |
| 9.  Village of Woodworth | .1614 |
| 10.  Village of Forest Hill | .1524 |
| 11.  Village of McNary | .1311 |

---

5.  The purposes for which the distributed funds can be used, as now found in § 23–207, are as follows:
(a) In the case of the Parish, for the purpose of constructing and maintaining public roads, highways and bridges and other capital improvements, paying salaries of Parish employees, and for any other lawful corporate purposes; with such tax proceeds to be subject to funding into bonds in the manner provided by R.S. 33:2721 to R.S. 33:2734, inclusive, for the purpose of paying all or any part of the cost of one or more capital improvements;
(b) In the case of the Parish School Board, for the purpose of supplementing other revenues available to the School Board for the payment of salaries of teachers and other personnel employed by the School Board;
(c) In the case of the incorporated municipalities (other than the City of Alexandria), for any lawful corporate purpose (including capital improvements), with the proceeds to be subject to funding into bonds in the manner provided by the laws of the State of Louisiana, for the purpose of paying all or any part of the cost of one or more capital improvements; provided, however, that any such bonds must be approved by the electors of the issuing municipality at an election held in such municipality in accordance with the provisions of R.S. 33:2721 to R.S. 33:2734, inclusive;
(d) In the case of the City of Alexandria, for the purpose of paying general operating expenses of the City and paying salaries of City employees.

6.  *See* La.Rev.Stat.Ann. §§ 33:51–55 (West 1951) (procedures for municipal incorporation at that time).

7.  Neither does the scheme provide for the de-incorporation of one of the participating municipalities.

8.  Ironically, assuming that larger cities generate more tax dollars, Ball contributes more in tax revenues than seven of the nine other incorporated municipalities:
[stipulated figures of the Rapides Parish Planning Commission]

| Municipality | 1980 Population | Percentage of Total Parish Population |
|---|---|---|
| 1.  City of Alexandria | 51,603 | 38.35 |
| 2.  City of Pineville | 11,891 | 8.8371 |
| 3.  Town of Ball | 3,397 | 2.5246 |
| 4.  Town of Lecompte | 1,676 | 1.2456 |
| 5.  Town of Glenmora | 1,492 | 1.1088 |
| 6.  Town of Boyce | 1,107 | .8227 |
| 7.  Town of Cheneyville | 854 | .6347 |
| 8.  Village of Forest Hill | 483 | .359 |
| 9.  Village of Woodworth | 400 | .2973 |
| 10.  Village of McNary | 241 | .1791 |
| Unincorp'd Rapides Parish | 61,414 | 45.6413 |

---

Ball is also the fastest growing municipality in the Parish.  It grew in population by about 97% between 1973, the year after its incorporation, and 1980.  In contrast, five of the other nine incorporated municipalities lost residents over the same period.  Of those that did not, Forest Hill grew by about 25%; Lecompte, about 10%; Pineville, about 8%; and Alexandria, less than 1%.  Unincorporated Rapides Parish also increased in population, by about 18%.

zens of Ball have forked over their share of fiscal fixings for 12 years, but when the annual economic entree is ready to be served the Town has never had a place at the Parish table.[9]

In May 1976, the appellants brought suit in federal court against the eleven governmental bodies receiving funds under the plan. They asserted that the Parish plan transgressed the right of the Town's residents to constitutional due process and equal protection.[10] They sought, alternatively, the Town's fair share of all revenue produced from the tax since the Town's incorporation in 1972; its fair share in all current and future revenue produced from the tax; an injunction barring further collection of the tax so long as its distribution remained unconstitutional; and other general and equitable relief. In March 1977, the District Court held that the action was precluded by 28 U.S.C. § 1341 and dismissed the suit. This Court reversed that judgment in June 1979. *See supra*, n. 1.

Less than four months later, the Parish Police Jury proposed a revision to the distribution scheme which would have included the Town as a direct recipient of the tax revenues.[11] On December 8, 1979, a majority of the voting Parish citizens rejected the new plan,[12] and the distribution scheme now embodied in section 23–207, *see supra*, n. 3, remained unchanged.[13]

Thereafter, the parties agreed to a determination by the Trial Judge on the merits based on stipulated facts and briefs. In September 1982, the District Court held for the Parish and the other defendants. It declined to interfere in "[a] political decision ... made by the citizens of Rapides Parish as to how the tax money should be distributed."[14] It reasoned that

> [T]he tax referendum distribution scheme did not discriminate in any manner against Ball at the time it was passed. If there is any discrimination it is due to the voluntary act of residents of the Town of Ball to incorporate—they created the class. Under Ball's theory any time a few people decided to incorporate, the entire distribution scheme of the parish sales tax would come to a halt.

The appellants noticed their appeal and reurge their constitutional claims to this Court.[15] Before we reach the gist of their

---

9. And the tax revenues have historically been quite a dish. Using the figures of the Rapides Parish Planning Commission, over $44 million in Parish sales tax revenues were distributed between 1973 and mid-1981. Of this, over $18 million went directly to the nine participating municipalities. Moreover, tax revenues have increased each year (through 1980) at an average of 12% a year, although in some years more than in others.

10. Resolving this case on equal protection grounds, we hold—without detailed articulation and for similar reasons—that there is no denial of due process.

11. The October 9, 1979 proposal allotted to Ball 1.46% of the annual sales tax revenues and deducted about that percentage from the shares due to each of the other recipients. The record does not disclose on what basis that figure was determined.

12. The proposition lost 13,822 (45.33%) to 16,-670 (54.67%). Counsel for appellees stated at oral argument that every voting area in the Parish rejected the change except the one encompassing the Town of Ball.

13. This reaffirmation of the status quo by a majority of the Parish voters, despite the

changed circumstances, undercuts any argument that the exclusion of Ball from a direct share in the tax funds is inadvertent.

14. Contrary to what may be implied in this statement, we find no constitutional significance in that a majority of the voters of the Parish did directly what in other circumstances is done vicariously through a majority of elected representatives. Voters, like legislators, can create constitutionally offensive classifications. When properly challenged such classifications must fall, notwithstanding their origin.

15. Counsel for Ball stated at oral argument that the Town also appealed, unsuccessfully, to the Louisiana Legislature for relief from the inequity of the Parish tax plan. *Cf.* 1983 La.Acts 332 (Legislature authorized and directed the West Baton Rouge Parish Police Jury to reallocate on a per capita basis that parish's sales tax revenues among the parish and its incorporated municipalities after each federal census, commencing in 1983.

Moreover, the Town apparently can receive no relief from the Parish Police Jury. One court has stated that a parish police jury has neither the duty nor general authority to unilaterally reallocate sales tax revenues among par-

complaint, however, we must address two arguments raised by the Parish.

### Is There a Right to a Refund?

The Parish first argues that this is merely a suit to force it to refund to Ball the amount of sales tax previously and currently paid by citizens of the Town. It quite accurately points out that the Supreme Court "has repudiated the suggestion, whenever made, that the Constitution requires the benefits derived from the expenditure of public moneys to be apportioned to the burdens of the taxpayer."[16]

This argument misreads the aim of the appellants. They seek only to be treated on equal terms with all other residents of incorporated municipalities in the Parish. Nonetheless, we do not dispute the Parish's

point. As the District Court correctly held, the appellants have no claim to "benefits due from amounts paid." *See supra*, n. 16 and accompanying text. But, of course, that well-established principle does not resolve this case.

### Does Equal Protection Apply?

More relevant is the Parish's second and main argument in its defense. It asserts that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution simply does not apply to a state's actions or policies in distributing its tax revenues and thus has no bearing on section 23–207.[17]

▪ Although we find no controlling precedent on this issue,[18] our answer to

---

ish municipalities. *See Town of Brusly v. West Baton Rouge Parish Police Jury*, 283 So.2d 288, 289 (La.Ct.App.), *writ ref'd*, 284 So.2d 776 (La. 1973).

**16.** *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 523, 57 S.Ct. 868, 879, 81 L.Ed. 1245 (1937). There, the Court also observed

> Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied.

*Id.* at 521–22, 57 S.Ct. at 878 (footnote omitted).

**17.** In support of this broad proposition, the Parish cites *Hess v. Mullaney*, 213 F.2d 635 (9th Cir.), *cert. denied*, 348 U.S. 836, 75 S.Ct. 50, 99 L.Ed. 659 (1954). There, the Ninth Circuit scrutinized a general 1% property tax for the Territory of Alaska against claims that the tax violated equal protection because it differentiated between property outside incorporated cities and school and public utility districts and property within such cities and districts. The tax was assessed on all property, but the funds collected from property within the cities and districts were to be retained by those entities for their own use. Taxpayers owning "outside" property brought suit, asserting that the scheme amounted to a tax for the support of the Territory solely on their property.

The Court upheld the legislation. It reasoned that the same result would flow from a system under which the State "first collected into its treasury all the proceeds of the tax from all sources and then appropriated amounts equal to those collected from the municipalities and districts to such entities." *Id.* at 640. Such action by the State would not be constitutionally im-

proper, since "[n]o requirements of uniformity or of equal protection of the law limit the power of a legislature in respect to allocation and distribution of public funds." *Id.*

*See also* 84 C.J.S. *Taxation* § 34 (1954 & Supp. 1983) ("Constitutional provisions requiring equality and uniformity do not relate to the distribution or application of the revenue derived from taxation, and hence statutes relative to such matters cannot be held invalid as violative of those requirements.") (citing *Hess v. Mullaney* and collecting state cases).

**18.** In *Levy v. Parker*, 346 F.Supp. 897 (E.D.La. 1972), *aff'd*, 411 U.S. 978, 93 S.Ct. 2266, 36 L.Ed.2d 955 (1973), a three-judge district court (including Judge Wisdom and then-District Judge Rubin of this Court) reviewed Louisiana's scheme for distributing property tax relief funds. It found no direct precedent to apply the requirements of equal protection, but instead looked to the broad scope of the Clause.

> The Equal Protection Clause, therefore, reaches all state actions. It assures equality not only in the imposition but also in the distribution of state revenues. Even largesse must be dispensed with an even hand. Tax relief funds, designed to assist localities by making funds raised by state taxes available to local governmental agencies, must be administered by statute and in practice so as to avoid that governmental favoritism to one person over another that the Fourteenth Amendment was designed to proscribe. The failure to accord equal protection to all persons may not be justified by the sophistry that the receipt of funds from the legislature is a 'privilege' and not a 'right.'

*Id.* at 903 (citations omitted). Concluding also that the scheme "establishes a rule for distribut-

whether a state need conform to the basic requirements of equal protection in distributing tax revenues is instead clearly indicated in the present and historical breadth of the Clause. But, as we point out, this is just the beginning: accepting the idea that equal protection applies, the real question then becomes: did the enacting body have a rational basis for the disputed action?

The Clause was enacted in 1868 as part of the Fourteenth Amendment, which was directed at the destructive continuing racial discrimination after the Civil War. Like many of the fundamental provisions in the Constitution, the terms of equal protection were hardly limited and, at the same time, are less than instructive: [19]

No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws.

But it is clear that, at least on its face, the Clause has no exception for a state when it distributes its tax revenues.

Initially, the Clause was narrowly construed.[20] It was given a backseat to the Due Process Clause, which was also enacted in the Fourteenth Amendment. In fact equal protection was so disfavored that, during the heyday of "Lochnerizing,"[21] it was called "the usual last resort of constitutional arguments."[22]

■ Despite its hesitant judicial adoption, however, equal protection is no longer an orphan of the Civil War Amendments. The Clause reaches far beyond its original aim of discriminations by race.[23] Its language was not limited to racial considerations. Rather, its guarantee is both simple and wide—equal and uniform governmental classifications.[24] Since, basically, all laws or rules in some way classify,[25] it is

ing state funds that is no rule at all," *id.,* the Court struck down the plan as irrational.

Although we find Judge Rubin's characteristically cogent opinion for the Court to be persuasive, of course we are not bound by it. A summary affirmance by the Supreme Court can not be read as an adoption of a district court's reasoning. *See Zobel v. Williams,* 457 U.S. 55, 57, 64 n. 13, 102 S.Ct. 2309, 2311, 2315 n. 13, 72 L.Ed.2d 672 (1982). It is of some relevance, however, that the issue raised by the appellants in *Levy* in their direct appeal to the Supreme Court was whether a state is subject to the Equal Protection Clause in the manner in which it distributes tax funds to its political subdivisions. Jurisdictional Statement for Appellants at 4, 8, *Parker v. Levy,* 411 U.S. 978, 93 S.Ct. 2266, 36 L.Ed.2d 955 (1973), *aff'g* 346 F.Supp. 897 (E.D. La.1972).

**19.** *Cf.* Perry, *Modern Equal Protection: A Conceptualization and Appraisal,* 79 Colum.L.Rev. 1023, 1025 (1979) ("The language of the clause, after all, is opaque."); Fiss, *Groups and the Equal Protection Clause,* 5 Phil. & Pub.Aff. 107, 108 (1976) ("the text [of the Clause] has no meaning").

**20.** *See generally* G. Gunther, *Cases and Materials on Constitutional Law,* ch. 10, 670–71 (10th ed. 1980).

**21.** *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (invalidating New York's maximum hours law for bakers), has come to typify the period of "substantive due process" review, during which the Supreme Court over a strong dissent invalidated state

economic and social legislation for interfering with the liberty of contract.

**22.** *Buck v. Bell,* 274 U.S. 200, 208, 47 S.Ct. 584, 585, 71 L.Ed. 1000 (1927) (Holmes, J.).

**23.** *See infra,* nn. 38, 41.

**24.** "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (*quoting F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). *Cf. Lehr v. Robertson,* 463 U.S. 248, ——, 103 S.Ct. 2985, 2995, 77 L.Ed.2d 614 (1983) ("The concept of equal justice under law requires the State to govern impartially.").

**25.** "Classification is the essence of all legislation...." *Clements v. Fashing,* 457 U.S. 957, 967, 102 S.Ct. 2836, 2845, 73 L.Ed.2d 508 (1982). *See also* Perry, *supra,* n. 19, at 1068 (original emphasis):

Every time an agency of government formulates a rule—in particular, every time a legislature enacts a law—it classifies. The rulemaker specifies the class of persons that a rule will govern—*e.g.,* 'no driver's license shall be issued to *anyone under sixteen years of age'*—or the activity or class of activities to be regulated—*e.g.,* 'on Sundays no one may engage in *the sale of alcoholic beverages.'*

Although most classifications are legislative, equal protection also applies to non-legislative state action. *See Moose Lodge v. Irvis,* 407 U.S. 163, 179, 92 S.Ct. 1965, 1974, 32 L.Ed.2d 627 (1972) ("State action, for purposes of the Equal Protection Clause, may emanate from rulings of

not surprising then that the Clause has become so central. Equal protection may even be "an aspect of [a] broader constitutional requirement that there must be a 'rational' connection between legislative means and ends."[26]

Obviously, the present scope of the Clause is indeed broad. But it is clear that the Supreme Court applied the requirements of equal protection to classifications in what can be termed "economic" legislation long before the emergence of modern equal protection. In fact, we find no instance where the Supreme Court has specifically held a particular form of fiscal lawmaking to be wholly outside the voluminous skirt of equal protection.[27] In short,

the Supreme Court finds nothing constitutionally sacred about economic lawmaking, and has reviewed the most common state economic regulations.[28] Moreover, the Court has long examined tax assessment[29] and exemption[30] plans. Of crucial if not conclusive relevance, however, is that the Court has routinely subjected state revenue expenditure and financing programs to the requirements of equal protection.[31] In these cases there is not the faintest intimation that while a state is restricted to uniformity and equality in deciding how and from whom it will raise state revenues it is loosed of this constitutional tether the moment it begins to spend the funds that it collects.

administrative and regulatory agencies as well as from legislative or judicial action."); *see also Shelley v. Kraemer,* 334 U.S. 1, 14, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) (judicial action); *Yick Wo v. Hopkins,* 118 U.S. 356, 373, 6 S.Ct. 1064, 1072, 30 L.Ed. 220 (1886) (administrative action).
  Of course, for purposes of the Equal Protection Clause, state action includes the actions of its political subdivisions. *Memorial Hosp. v. Maricopa County,* 415 U.S. 250, 256, 94 S.Ct. 1076, 1081, 39 L.Ed.2d 306 (1974); *Avery v. Midland County,* 390 U.S. 474, 480–81, 88 S.Ct. 1114, 1118–19, 20 L.Ed.2d 45 (1968).

26. G. Gunther, *supra,* n. 20, at 676–77.

27. *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937), and *General Am. Tank Car Corp. v. Day,* 270 U.S. 367, 46 S.Ct. 234, 70 L.Ed. 635 (1926), which the Parish cites on this point, involve tax assessment plans and in no way foreclose equal protection review of state tax distribution schemes.

28. *See, e.g., Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (state law banning retail sale of milk in plastic containers but allowing sale in paperboard containers); *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (city ordinance barring vendors' selling of foodstuffs from pushcarts in a certain area of the city but exempting a small number of long-time vendors); *Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (city regulation prohibiting advertising only on vehicles promoting products not of the owner of the vehicle); *accord United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct.

778, 82 L.Ed. 1234 (1938) (federal ban on interstate shipment of "filled milk").

29. *See, e.g., Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) (state "retaliatory" tax on foreign insurance companies); *General Am. Tank Car Corp. v. Day,* 270 U.S. 367, 46 S.Ct. 234, 70 L.Ed. 635 (1926) (state tax on the rolling stock of foreign corporations).

30. *See, e.g., Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974) (state property tax exemption for widows but not widowers); *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (state constitutional exemption of ad valorem tax on personal property owned by natural persons but not corporations); *accord Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (federal tax exemption for certain non-profit organizations that do not engage in substantial lobbying).

31. *See, e.g., Plyer v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (state refusal to reimburse local school boards for education of children of illegal aliens); *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (state dividend program to distribute part of annual state mineral income); *San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (state system of financing public education). In *Rodriguez,* the Court observed that the plaintiffs' suit was "a direct attack on the way in which Texas has chosen to raise *and dispense* state and local tax revenues." *Id.* at 40, 93 S.Ct. at 1300 (emphasis added).

■ When equal protection was a constitutional plea of last resort, the Parish's argument may have had merit. That era has surely passed. Equal protection has become a stout shield for protecting against the discriminatory bite of governmental classification. As the Supreme Court has stated, when a state distributes benefits unequally, the distinctions it makes are subject to the scrutiny of equal protection.[32] Here, the benefits sought to be distributed happen to be tax revenues. We hold that in doling out its tax dollars, a state and its subordinate governing bodies stand in no constitutional twilight zone above the elemental commands of equal protection. The Constitution simply leaves no shadow in which such governments may hide, to disburse the public wealth with caprice bounded only by their institutional imaginations.[33]

**32.** *Zobel v. Williams,* 457 U.S. 55, 60, 102 S.Ct. 2309, 2312, 72 L.Ed.2d 672 (1982).

**33.** It is difficult to reconcile what the Parish and *Hess v. Mullaney, supra,* n. 17, espouse as the law with their concession that equal protection has long applied to state tax exemptions and assessments. Obviously, by distributing tax revenues to favored individuals, a state could discriminatorily exempt those members of the class from that tax. Equally, by distributing tax revenues to the non-disfavored portion of the class, a state could discriminatorily assess a tax on the disfavored members. In short, under their view, equal protection would no longer apply to de facto assessments of or exemptions from state taxes.

**34.** *Cleburne Living Center v. City of Cleburne,* 726 F.2d 191, 195–97 (5th Cir.1984); *see generally* G. Gunther, *supra,* n. 20, at 670–75; L. Tribe, *American Constitutional Law,* ch. 16 (1978).

It has, however, been suggested that the Court uses a "spectrum of standards" in equal protection scrutiny, *see San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 98–99, 93 S.Ct. 1278, 1330, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting), or a single standard of equal protection review with varyingly heavy burdens of proof, which decides whether "the harm done to the disadvantaged class by the legislative classification is disproportionate to the public purposes the measure is likely to achieve." *See Michael M. v. Sonoma County Superior Court,* 450 U.S. 464, 497–98 n. 4, 101 S.Ct. 1200, 1218–1219 n. 4, 67 L.Ed.2d 437 (1981) (quoting Cox, *Book Review,* 94 Harv.L.Rev. 700, 706 (1981)) (Stevens, J., dissenting).

## What Standard of Review?

Concluding that equal protection applies to the distribution scheme of section 23–207 does not end our initial inquiry. We must next determine which of the levels of equal protection review is warranted here. At the risk of describing a well-mapped landscape, we set out a brief overview of those levels.

■ Equal protection is now a three-tiered analysis.[34] Normally, since governing requires a large amount of classifying, based often on subtle but real differences among classes of persons, the Supreme Court looks no farther than whether the distinctions have some "rational basis." The formulation of this level of review has varied in the past.[35] Basically, though, the Court presumes that the challenged statutory distinctions are constitutional and requires only that they be rationally related to a legitimate state interest.[36]

**35.** The Court once observed, "The most arrogant legal scholar would not claim that all of [its rational-basis] cases applied a uniform or consistent test under equal protection principles." *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 176 n. 1, 101 S.Ct. 453, 460 n. 1, 66 L.Ed.2d 368 (1980). Compare *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–562, 64 L.Ed. 989 (1920):

[T]he classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.

with *McDonald v. Board of Educ.,* 394 U.S. 802, 808, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969):

The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them.

**36.** *See, e.g., City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Dunagin v. City of Oxford,* 718 F.2d 738, 753 (5th Cir.1983) (en banc); *Sandefur v. Cherry,* 718 F.2d 682, 688 (5th Cir.), *modified,* 721 F.2d 511 (5th Cir.1983). In determining whether that standard has been met, the Court asks two questions: "(1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable

Some classifications, however, will almost never be based on legitimate governmental reasons. In those cases the Court employs a piercing "strict scrutiny." [37] Where the challenged law operates to the peculiar disadvantage of a "suspect" class or interferes with the exercise of a "fundamental" right,[38] the Court accords the distinction no presumption of constitutionality. On the contrary, such a classification must further a compelling governmental interest [39] which cannot be served by an alternative means less burdensome to the suspect class or fundamental right or interest.[40]

Finally, the Court has fashioned an "intermediate" or "heightened" scrutiny to apply to legislative classifications which, while not facially invidious, nonetheless give rise to recurring constitutional difficulties.[41] To pass muster, these classifica-

---

for the lawmakers to believe that use of the challenged classification would promote that purpose?" *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981). *See also Exxon Corp. v. Eagerton,* 462 U.S. 176, ——, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 [513] (1983) ("Under [the rational-basis] standard a statute will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose."); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 461–62, 164, 101 S.Ct. 715, 722–723, 66 L.Ed.2d 659 (1981); *Arceneaux v. Treen,* 671 F.2d 128, 132 (5th Cir.1982).

**37.** Strict scrutiny, which has been termed "'strict' in theory and fatal in fact," Gunther, *Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 8 (1972), *quoted in Dart v. Brown,* 717 F.2d 1491, 1498 (5th Cir. 1983); *Arceneaux v. Treen,* 671 F.2d 128, 131 (5th Cir.1982), is generally thought to have been germinated in *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938). On the current relevance of footnote 4, see Powell, Carolene Products *Revisited,* 82 Colum.L.Rev. 1087 (1982); Lusky, *Footnote Redux: A* Carolene Products *Reminiscence,* 82 Colum.L.Rev. 1093 (1982).

**38.** A suspect class is normally what *Carolene Products, supra,* n. 37, described as a "discrete and insular" minority. *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). These are classes which have been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). Included in these classifications are those based on race, *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), national origin, *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and alienage, compare *Bernal v. Fainter,* —— U.S. ——, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984), and *Graham v. Richardson,* 403 U.S. 365,

91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), with *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), and *Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979).

Rights are fundamental if their source, explicitly or implicitly, is the Constitution. *Plyer v. Doe,* 457 U.S. 202, 217 n. 15, 102 S.Ct. 2382, 2395 n. 15, 72 L.Ed.2d 786 (1982); *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 33–34, 93 S.Ct. 1278, 1296–1297, 36 L.Ed.2d 16 (1978); *Dunagin v. City of Oxford,* 718 F.2d 738, 752 (5th Cir.1983) (en banc). One such right, although not expressly in the Constitution, is the right to travel among the states. *Memorial Hosp. v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The Supreme Court has also recognized the fundamentality of participation in state elections on an equal basis with other citizens in the jurisdiction, *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972); *Kramer v. Union Free School Dist.,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and of access to the courts for a criminal appeal, *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 818 (1963); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

**39.** *See Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969).

**40.** *See Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972).

**41.** *Plyer v. Doe,* 457 U.S. 202, 217–18 & n. 16, 102 S.Ct. 2382, 2395 & n. 16, 72 L.Ed.2d 786 (1982). The classifications which have evoked varying degrees of heightened scrutiny include those based on sex, *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and illegitimacy, compare *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), with *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978). *See also Cleburne Living Center v. City of Cleburne,* 726 F.2d 191 (5th Cir.1984) (the mentally retarded).

tions must serve important governmental objectives and be substantially related to achievement of those objectives.[42]

■ We find that section 23–207 or its impact does not create a suspect classification nor infringe rights or interests heretofore recognized as constitutionally fundamental. However, the scheme probably does discourage future incorporation in the Parish.[43] It could be argued that, although a municipal corporation has no specific protections in the Constitution,[44] joining with nearby state residents to create an incorporated governmental unit may involve personal freedoms which justify greater judicial scrutiny of state action limiting the ability to incorporate.[45] However, because we hold the Parish plan satisfies the elemental equal protection requirement of rationality, we do not explore that contention.

### Any Rational Basis?

The Supreme Court has long stressed that federal courts must refrain from assuming the role of "superlegislature to judge the wisdom or desirability of legislative policy determinations made in … the local economic sphere."[46] In addition, it

---

**42.** *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).

**43.** Under § 23–207, tax revenues are distributed only to the incorporated municipalities (save, of course, for Ball). *See* La.Rev.Stat.Ann. § 33:2723 (West 1966) (sales tax revenues may be divided between "the parish, the parish school board and the several incorporated cities, towns and villages in the parish"). Citizens of those cities have direct control over their share of the tax proceeds. Citizens of unincorporated cities (and Ball), on the other hand, must rely on the Police Jury (as the general Parish authority) for their benefits from the tax funds.

Further, citizens of incorporated cities control relatively greater funds. The Police Jury, which represents over 45% of the citizens of the Parish, receives only 18% of the non-school tax funds. Compare *supra,* nn. 3 & 7. Conversely, the incorporated cities receive percentage shares greater than their proportionate shares of the total Parish population. *Id.* (This disparity, of course, may be perfectly legitimate; we merely mention it as another of the benefits once conferred to citizens of incorporated cities.)

Citizens of cities incorporated after 1967 (like those of Ball) are no longer accorded these material benefits. Future incorporation is thus less attractive.

**44.** A municipal corporation is a creature of state law. *See* La.Rev.Stat.Ann. § 33:51–55 (West 1951 & Supp.1984); *see also Pyle v. City of Shreveport,* 215 La. 257, 40 So.2d 235 (1949); *State v. Hagen,* 136 La. 868, 67 So. 935 (1915). It was long ago established that, as a rule, "the Constitution does not interfere with the internal political organization of states." *Rogers v. Brockette,* 588 F.2d 1057, 1069 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979), *citing to Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 629–30, 4 L.Ed. 629, 657 (1819); *see also City of Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); *Hunter v. Pittsburg,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907).

**45.** It is not unlikely that the creation of an incorporated municipality by a group of state citizens may be prompted by a desire for a clearer, unified voice in their parish (or county or township) courthouse or state capital. Municipal corporations have long functioned as links between citizens and their state and, more immediately, between citizens and regional governmental bodies.

In such a case, the incorporated local government could be an integral fiber in the bond of communication between those citizens and their state. If that were true, a serious question could arise whether the state government could to certain persons deny or qualify the right to incorporate, after it had extended that right to other persons similarly situated, without appropriately weighty reasons. *Cf. Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (state's redefining of municipal boundaries would violate Fifteenth Amendment if done to disenfranchise blacks). Of course, a central inquiry would be whether the denial or qualification in fact limited the opportunity for political expression. Denying a municipal corporation of any measure of independent economic wherewithal by which it could provide services to its residents, and thus qualifying the right of incorporation, might so emasculate that entity as to render it politically impotent.

**46.** *New Orleans v. Dukes,* 427 U.S. 297, 304, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976); *see also Laird v. Board of Trustees of Inst. of Higher Learning,* 721 F.2d 529, 533 (5th Cir.1983).

In *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), the Court restated the general principles of equal protection review of economic legislation:

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classi-

has stated that "[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes." [47]

In *Taxation With Representation*, the Court emphasized the deference due tax legislation:

> The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized.... The passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative

arrangement to negative every conceivable basis which might support it. [48]

Thus, the distribution scheme of section 23–207 comes to this Court girded with a strong presumption of constitutional acceptability. Such respect does not relegate equal protection review for rationality to a perfunctory rubber-stamping of legislative whim. The rational-basis standard "is not a toothless one." [49]

We have already stated that rational-basis review involves two inquiries. *See supra*, n. 36 and accompanying text. Thus, we must ask first whether the distribution schedule has a legitimate purpose. If it does, we must determine whether the Parish electorate could rationally believe that denying any share of the revenues to one of ten incorporated Parish cities furthers that purpose.

### Rational Basis Available

██ Turning the table on the burden of one attacking the classification, the problem becomes clearer by looking at it in terms of whether the parish can show any "conceivable basis" for this apparent discrimination.

Elastic as is this standard and as free as it is from any requirement that the ground be legislatively expressed [50] in some formal

---

fication has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' 'The problems of government are practical ones and may justify, if they do not require, accommodations—illogical, it may be, and unscientific.' ...
... [The rational-basis standard] is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy. *Id.* at 175, 101 S.Ct. at 459 (*quoting Dandridge v. Williams*, 397 U.S. 471, 485–86, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970)) (citations omitted). *See also Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979); *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976); *Sandefur v. Cherry*, 718 F.2d 682, 688 (5th Cir.), *modified*, 721 F.2d 511 (5th Cir.1983).

**47.** *Exxon Corp. v. Eagerton*, 462 U.S. 176, ——, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 [514] (1983)

(*quoting Regan v. Taxation With Representation of Washington*, 461 U.S. 540, ——, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983)).

**48.** *Id.* at ——, 103 S.Ct. at 2002 (*quoting Madden v. Kentucky*, 309 U.S. 83, 87–88, 60 S.Ct. 406, 407–08, 84 L.Ed. 590 (1940) (footnotes omitted)). *See also Austin v. New Hampshire*, 420 U.S. 656, 661–62, 95 S.Ct. 1191, 1195, 43 L.Ed.2d 530 (1975); *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 40–41, 93 S.Ct. 1278, 1300–01, 36 L.Ed.2d 16 (1973); *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359–60, 93 S.Ct. 1001, 1003–04, 35 L.Ed.2d 351 (1973); *Allied Stores of Ohio v. Bowers*, 358 U.S. 522, 526–27, 79 S.Ct. 437, 440, 3 L.Ed.2d 480 (1959).

**49.** *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976).

**50.** *See United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d ·368 (1980) ("[T]his Court has never insisted that a legislative body articulate its reasons for enacting a statute.").

fashion, a number of conceivable grounds readily appear.

One of the most conceivable is the likelihood that either the parish jury, or later on, the electorate, were of the view that the Town of Ball does not need the proceeds as much as do other communities. Additionally, denying the Town of Ball the right to share in the proceeds, assured to the parish jury the freedom to determine in the near or far future the relative needs for other communities, or causes, or both. Along similar lines, the parish jury could have felt that in this parish there was no need for an additional incorporated town and denial of sales tax proceeds would be an effective counterforce. Likewise, since at the time the parish scheme of allocation was proposed to and accepted by the electorate it was obviously a rational one, nothing makes it irrational simply because no contingency was made for new municipalities

that might incorporate after the plan was in place. Treating the problem of the Town of Ball would also pose the problem of precedent to the parish jury, electorate, or both. If we afford relief to the Town of Ball, will we have to do likewise as each unincorporated village determines to incorporate? Quite conceivably the parish jury, electorate, or both, could reasonably conclude that such prospective chaos should be avoided.

But whatever concerns might arise as to anyone or all of these legitimate "conceivables" the parish, the electorate, or both had a rational basis for avoiding the hazard that the safety and security of bonds that certain of the participating governmental subdivisions have funded on their shares of the tax revenues would be jeopardized.[51] This reflects the legislative desires to ensure bond repayment in authorizing its parishes to levy the 1% sales and use tax.[52]

**51.** La.Rev.Stat.Ann. § 33:2724 (West 1966) provides:

> Any parish, parish school board or incorporated municipality entitled to receive any avails or proceeds of any sales or use tax, or sales and use tax, imposed under the authority of R.S. 33:2721 through 33:2734 ... may through its governing body fund into bonds ... the avails of the tax ... for the purpose of paying all or any part of the cost of one or more public improvements....

Under *id.* at § 2725, the parish electorate must approve any such funding, as it has here. *See supra,* n. 4. Any resulting bonds are not general obligation bonds, *see* § 2727A, but are secured on the sales tax revenues, *see* § 2727B. The bonds may run for up to 25 years, *see* § 2726, and have all the qualities of negotiable paper, *see* § 2732.

**52.** Several provisions in La.Rev.Stat.Ann. §§ 33:2721–34 (West 1966 & Supp.1984) attest to the design of the Legislature to enhance the ability of political entities to repay bonds based on expected future sales tax revenue allocations. Section 2726 provides:

> ... The maturities of the bonds shall be so arranged that the total amount of principal and interest falling due in any year, together with principal and interest falling due in such year on all bonds theretofore issued hereunder and then outstanding, shall never exceed seventy-five per cent of the amount of sales tax revenues estimated by the governing body to be collected in such year.

The 75% limit would result in a 25% cushion between debt obligations and anticipated reve-

nues, increasing the likelihood of debt repayment by accounting for unexpected shortcomings in tax collections.

Section 2727 even more plainly shows the Legislature's intent to protect bondholders:

> D. *When any bonds shall have been issued hereunder neither the legislature nor the parish may* discontinue or decrease or permit to be discontinued or decreased the tax in anticipation of the collection of which such bonds have been issued, or *in any way make any change in the allocation of the proceeds of such tax which would diminish the amount of the sales tax revenues to be received by the entity which issued the bonds,* until all of such bonds shall have been retired as to principal and interest ....
>
> \* \* \* \* \* \*
>
> F. ... *[T]he obligation of the governing body of the parish to continue* to levy, collect and allocate the tax as therein provided [in the resolution authorizing the issuance of bonds] and *to apply the revenues* derived therefrom *in accordance with the provisions of said resolution,* shall be irrevocable until such bonds have been paid in full as to principal and interest, and *shall not be subject to amendment in any manner which would impair the rights of the holders from time to time of such bonds or which would in any way jeopardize the prompt payment of principal thereof or interest thereon.*

(Emphasis added). As subsection F in particular makes evident, the Legislature sought by these clauses to safeguard the revenue bases from which bonding entities would repay their contractual obligations.

A prime objective of the allocation scheme is to secure the repayment of bonds. Consequently, if the participation of new municipal corporations in the scheme would "impair the rights of the holders from time to time of such bonds or ... would in any way jeopardize the prompt payment of principal thereof or interest thereon,"[53] prohibiting the inclusion of such cities would clearly promote the desired aim.

Whether the jeopardy to the security—and hence marketability—of funded bonds is real or whether subsequent legislative action[54] may—from the standpoint of pure legality—have eliminated this hazard, the fact remains that there is ample basis for the reasonable conclusion that changing the allocation system to accommodate the Town of Ball might imperil the security of funded, issued bonds. There being a rational basis for this very conceivable concern on the part of the parish, the electorate, or both, there has been no denial of the equal protection of the law.

AFFIRMED.

---

53. La.Rev.Stat.Ann. § 33:2727F (West 1966) (quoted *supra,* n. 52).

54. *See, e.g.,* La.Rev.Stat.Ann. § 33:2721 (West Supp.1984) pertaining to Lafayette Parish; 1983 La.Acts 332 pertaining to West Baton Rouge Parish.