Prince JOHNSON, et al., Plaintiffs,

v.

CITY OF DALLAS, et al., Defendants.

Civ. A. No. 3:94–CV–991–X.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 18, 1994.

Steven Peter Anderson, Mills Presby & Anderson, Dallas, TX, Jeffie Janette Massey,

Law Office of Jeffie J. Massey, Dallas, TX, for plaintiffs.

Sam A. Lindsay, Dallas City Attorney's Office, Dallas, TX, for defendants.

Darrell E. Jordan, Hughes & Luce, Dallas, TX, for Central Dallas Ass'n, amicus curiae, Cedars Ass'n, amicus curiae, Deep Ellum Ass'n, amicus curiae, State–Thomas Homeowners Ass'n, amicus curiae, West End Ass'n, amicus curiae.

Kerry L. Adams, Jennifer M. Hall, Howrey & Simon, Washington, DC, Maria Foscarinis, National Law Center on Homelessness & Poverty, Washington, DC, for National Law Center on Homelessness and Poverty, amicus curiae.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

NOW before the Court are Plaintiffs' Application for Temporary Injunction, filed on May 18, 1994, and the responses of Defendants and Amici. Having considered these filed materials, as well as the arguments of counsel and evidence adduced at the hearing held on June 2, 1994, the Court concludes that Plaintiffs' application should be **GRANTED** in part and **DENIED** in part. For the reasons set forth below, the Court concludes that, as applied, the sleeping in public ordinance does not comport with constitutional standards. However, the Court fails to discern constitutional infirmities in the remaining statute and city ordinances, either facially or as applied. To the extent that the Court's prior orders are inconsistent with this opinion, they are hereby vacated.

### I.

This case concerns the constitutionality of various city ordinances enacted, enforced or both, allegedly to remove homeless persons from public view in the city of Dallas and a state statute allegedly enforced for that purpose. Plaintiffs are themselves homeless, and they seek to represent a class of homeless persons. Defendants include the City of Dallas, the Dallas Police Department and members of the Dallas City Council. Plaintiffs attack, among other things, a city ordinance that would prohibit sleeping in public as well as the proposed eviction under the state criminal trespass statute of a homeless encampment under certain interstate highway bridges on the east side of Dallas' central business district. After a hearing on May 20, 1994, the Court granted Plaintiffs' application for a temporary restraining order, which prevented the City from enforcing certain ordinances and evicting persons living under the bridges, and scheduled a hearing for June 2 on Plaintiffs' motion for preliminary injunction. The Court hereby memorializes its ruling on the instant issues, which was rendered in a more summary fashion by order entered on June 2, 155 F.R.D. 581.[1]

### II.

Although Plaintiffs look to the Eighth Amendment[2] for primary support in their onslaught against the city ordinances and the state criminal trespass statute, the Supreme Court's decision in *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), which interpreted the Eighth Amendment as applied through the Fourteenth, is the animating force of their contentions. In *Robinson*, the Court considered a California statute making it a criminal offense for a person to "be addicted to the use of narcotics." *Id.* At Robinson's trial, the judge instructed the jury that the California statute made it unlawful

> either to use narcotics, or to be addicted to the use of narcotics.... That portion of the statute referring to the "use" of narcotics is based upon the "act" of using. That portion of the statute referring to "addicted to the use" of narcotics is based

---

1. The challenged ordinances not appearing in footnotes as they are discussed in the text appear in an appendix at the end of this opinion.

2. That constitutional mandate states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. The Supreme Court recognizes that the Eighth Amendment "imposes substantive limits on what can be made criminal and punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977).

upon a condition or status. They are not identical.... To be addicted to the use of narcotics is said to be a status or condition and not an act. It is a continuing offense and differs from most other offenses in the fact that [it] is chronic rather than acute; that it continues after it is complete and subjects the offender to arrest at any time before he reforms. The existence of such a chronic condition may be ascertained from a single examination, if the characteristic reactions of that condition be found present.

*Id.* at 662–63, 82 S.Ct. at 1418. Noting that the Court was required to take the statute as the state court read it, the Court recognized the problematic attending the criminalizing of mere status:

It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

We cannot but consider the statute before us as of the same category.

*Id.* at 666–67, 82 S.Ct. at 1420 (citation omitted). That addiction is an analogue to certain sicknesses occupied a prominent position in the Court's logic, and buttressed its holding:

We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day

in prison would be a cruel and unusual punishment for the "crime" of having a common cold.

*Id.* at 667, 82 S.Ct. at 1420–21. Justice White, whose views discussed below on the issue of "status" become important to Plaintiffs' assertions, began his dissent in *Robinson,* as follows: "If appellant's conviction rested upon sheer status, condition or illness or if he was convicted for being an addict who had lost his power of self-control, I would have other thoughts about this case. But this record presents neither situation." *Id.* at 685, 82 S.Ct. at 1430 (White, J., dissenting).

In *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), the defendant argued that an affinity between the facts of his case and those of *Robinson* compelled the overturning of his conviction. The *Powell* Court considered a Texas statute, which stated the following: "Whoever shall get drunk or be found in a state of intoxication in any public place, or at any private house except his own, shall be fined not exceeding one hundred dollars." *Id.* at 517, 88 S.Ct. at 2146. Powell had been arrested and charged under this statute with being found in a state of intoxication in a public place; he was convicted and fined $20. At his trial, his lawyer argued that he was "afflicted with the disease of chronic alcoholism, that his appearance in public [while drunk was] ... not of his own volition, and therefore that to punish him criminally for that conduct would be cruel and unusual, in violation of the Eighth and Fourteenth Amendments to the United States Constitution." *Id.* (internal quotation marks omitted).

After an extended dissertation on the dearth of professional consensus concerning the nature and causes of alcoholism, the court turned to *Robinson,* and distinguished that earlier case in these terms:

On its face the present case does not fall within [*Robinson's*] holding, since appellant was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion. The State of Texas thus has not sought to punish a mere status, as California did in *Robinson* .... Rather, it has imposed upon appel-

lant a criminal sanction for public behavior which may create substantial health and safety hazards, both for appellant and for members of the general public, and which offends the moral and esthetic sensibilities of a large segment of the community. This seems a far cry from convicting one for being an addict, being a chronic alcoholic, being "mentally ill, or a leper...." [*Robinson*, 370 U.S. at 666, 82 S.Ct. at 1420].

*Powell*, 392 U.S. at 532, 88 S.Ct. at 2154. The Court was chary of announcing an "important and wide-ranging new constitutional principle," *id.* at 521, 88 S.Ct. at 2149, on the facts of *Powell*. This cabined reading of *Robinson* stemmed at least in part from the Court's fear of supplanting with constitutional analysis traditional notions of criminal culpability and state sovereignty:

And unless *Robinson* is so viewed it is difficult to see any limiting principle that would serve to prevent this Court from becoming, under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility, in diverse areas of the criminal law, throughout the country.

*Powell*, 392 U.S. at 533, 88 S.Ct. at 2154. Later, the Court noted that "[t]raditional common-law concepts of personal accountability and essential considerations of federalism lead us to disagree with appellant." *Id.* at 535, 88 S.Ct. at 2155. Justice Black glossed the holding of *Robinson* thus:

The rule of constitutional law urged by appellant is not required by Robinson. In that case we held that a person could not be punished for the mere status of being a narcotics addict. We explicitly limited our holding to the situation where no conduct of any kind is involved.... The argument is made that appellant comes within the terms of our holding in *Robinson* because being drunk in public is a mere status or "condition." Despite this many-faceted use of the concept of "condition," this argument would require converting *Robinson*

into a case protecting actual behavior, a step we explicitly refused to take in that decision.

*Id.* at 541–42, 88 S.Ct. at 2159 (Black, J., concurring) (citations omitted).

Perhaps most relevant to this Court's task, Justice White's prescient comments in his concurring opinion relate homelessness to the issue of status as first conceived in *Robinson*:

The fact remains that some chronic alcoholics must drink and hence must drink *somewhere*. Although many chronics have homes, many others do not. For all practical purposes the public streets may be home for these unfortunates, not because their disease compels them to be there, but because, drunk or sober, they have no place else to go and no place else to be when they are drinking. This is more a function of economic station than of disease, although the disease may lead to destitution and perpetuate that condition. For some of these alcoholics I would think a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted under the Eighth Amendment—the act of getting drunk.

*Powell*, 392 U.S. at 551, 88 S.Ct. at 2163–64 (White, J. concurring) (footnote omitted). Justice White's fusion of homelessness and status implicates one of the questions before this Court; specifically, whether the former condition constitutes the latter legal category as imagined by the *Robinson* Court.

Recently, two United States district courts disagreed with one another in answering this question.[3] The homeless plaintiffs in *Pottinger v. Miami*, 810 F.Supp. 1551 (S.D.Fla. 1992), convinced the court of their status under *Robinson*. The court recognized that "[a]lthough the law is well-established that a person may not be punished for involuntary status, it is less settled whether involuntary

---

3. Another district court enjoined the City of Huntsville, Alabama from practices the court determined to be directed at the homeless and assumed with no discussion that homelessness

was a status, although the court cited no authority in support of its conclusion. *Church v. Huntsville*, No. 93–C–1239–S, 1993 WL 646401, at *2 (N.D.Ala. Sept. 23, 1993).

conduct that is inextricably related to that status may be punished." *Id.* at 1563. Yet with a nod toward the White concurrence in *Powell,* the court stated that "the *Powell* plurality was not confronted with a critical distinguishing factor that is unique to the plight of the homeless plaintiffs in this case: that they have no realistic choice but to live in public places." *Id.* After detailing expert testimony regarding whether homelessness is voluntary, the court concluded that "[i]n sum, class members rarely choose to be homeless." *Id.* at 1564. The court determined that "[a]s long as the homeless plaintiffs do not have a single place where they can lawfully be, the challenged ordinances, as applied to them, effectively punish them for something for which they may not be convicted under the eighth amendment—sleeping, eating and other innocent conduct." *Id.* at 1565.

In contradistinction, the court in *Joyce v. City & County of San Francisco,* 846 F.Supp. 843 (N.D.Cal.1994), reasoned that according Eighth Amendment status protection to homelessness would be an unwarranted extension of *Robinson.* Stating that "[d]epicting homelessness as 'status' is by no means self-evident," *id.* at 856, the court explicated the distinction it perceived the *Robinson* and *Powell* Courts to have made between status and act, but conceded that defining "status" would be elusive. However, certain factors such as the involuntariness of the acquisition of a particular quality, including the presence or not of the characteristic at birth, and the degree to which a person had control over the characteristic would aid the determination. The court then continued as follows:

> Examples of such "status" characteristics might include age, race, gender, national origin and illness. The reasoning of the [Supreme] Court in including drug addiction as status involved the analogy of drug addiction to a disease or an illness which might be contracted involuntarily. While homelessness can be thrust upon an unwitting recipient, and while a person may be largely incapable of changing that condition, the distinction between the ability to eliminate one's drug addiction as compared to one's homelessness is a distinction in kind as much as in degree. To argue that homelessness is a status and not a condition, moreover, is to deny the efficacy of acts of social intervention to change the condition of those currently homeless.
>
> The Court must approach with hesitation any argument that science or statistics compels a conclusion that a certain condition be defined as a status. The Supreme Court has determined that drug addiction equals a status, and this Court is so bound. But the Supreme Court has not made such a determination with respect to homelessness, and because that situation is not directly analogous to drug addiction, it would be an untoward excursion by this Court into matters of social policy to accord to homelessness the protection of status.

*Id.* at 857–58 (citation omitted).

■ Although this Court agrees that a critical distinction exists between status and act, it appears less apparent that the *Joyce* court's treatment of that distinction flows logically from the Supreme Court precedent to be examined on this issue. Both district courts correctly note that the question to be decided involves whether *Robinson* should be extended to cover conduct rather than mere status. While the statute in *Robinson* criminalized addiction, the ordinances and statute involved here strike at what can fairly be considered conduct or acts, sleeping in public or coercively soliciting, for instance. After careful consideration of the challenged laws, the Court concludes that the only ordinance susceptible of a colorable attack under the Eighth Amendment is the sleeping in public ordinance.[4] Neither *Robinson* nor even a

---

4. SEC. 31–13. SLEEPING IN A PUBLIC PLACE.
 (a) A person commits an offense if he:
 (1) sleeps or dozes in a street, alley, park, or other public place; or
 (2) sleeps or dozes in a vacant lot adjoining a public street or highway.

 (b) It is a defense to prosecution under Subparagraph (2) of this section if the person owns the vacant lot or has the consent of the owner to sleep or doze on the vacant lot.

tortured reading of that case compels a conclusion that criminalizing the removal of waste from receptacles, coercive solicitation, or trespassing—at all or during closed hours—impermissibly punishes for mere status rather than for conduct. To accept Plaintiffs' argument that these proscribed acts are a necessary correlative of homelessness would be to create a class of persons who are constitutionally immune from much of the criminal law. If one's homeless status entitled one to evade prosecution for removing waste from trash receptacles in order to find something to eat or wear, it is not difficult to rationalize constitutional protection for stealing food or clothing.[5]

■ Even so, Eighth Amendment scrutiny on the facts before the Court does not bode well for the sleeping in public ordinance. It should be a foregone conclusion that maintaining human life requires certain acts, among them being the consuming of nourishment, breathing and sleeping. The evidence before the Court, all of which was adduced either with the parties' filed materials, at the TRO hearing, the preliminary injunction hearing, or all three, demonstrates that at any given time there are persons in Dallas who have no place to go, who could not find shelter even if they wanted to—and many of them do want to—and who would be turned away from shelters for a variety of reasons. There are not enough beds available at the area shelters to accommodate the demand. Some persons do not meet particular shelter's eligibility requirements. For many of those homeless in Dallas, the unavailability of shelter is not a function of choice; it is not an issue of choosing to remain outdoors rather than sleep on a shelter's floor because the shelter could not provide a bed that one found suitable enough. The evidence demonstrates that for a number of Dallas homeless at this time homelessness is involuntary and irremediable. They have no place to go other than the public lands they live on. In other words, they must be in public. And it is also clear that they must sleep. Although

sleeping is an act rather than a status, the status of being could clearly not be criminalized under *Robinson*. Because being does not exist without sleeping, criminalizing the latter necessarily punishes the homeless for their status as homeless, a status forcing them to be in public. The Court concludes that it is clear, then, that the sleeping in public ordinance as applied against the homeless is unconstitutional.

It is important, though, to be clear about the relationship between the availability of shelter and the status of homelessness. In its supplemental response, the City of Dallas criticizes the Court for a statement made in an order:

The court's Order, dated June 2, 1994 noted that "... if there were a bed for everyone, homelessness would be a choice, not a status." Defendants respectfully submit, however, that the Supreme Court has not defined "status" as a function of the discretionary acts of others; such acts instead may result in a particular "condition." As the evidence adduced, housing provided to the homeless in Dallas under any program (completely free, through a mental illness or drug addiction program, and so on) is a matter for the discretion of the City, County and State. Moreover, there is no statutory or constitutional obligation for the City of Dallas to provide housing to the homeless. The court's language, quoted at the beginning of this paragraph, underscores the important distinction between a protectable, involuntary, unchangeable "status," and a "condition" subject to social intervention.

(Supplemental Resp. at 7–8) (citation omitted.) Defendants' recapitulation of these constitutional principles is accurate, although irrelevant. The Court does not take issue with the provision of housing or other services being in the City's discretion. The Court does not suggest that the City must provide the homeless with anything. As the Court has tried to make clear before, it is no part of

---

**5.** Reasonable minds could, of course, differ over the wisdom of criminalizing the conduct of a hungry man trying to feed himself by foraging through abandoned property in hopes of finding food thrown out by a restaurant or grocery store at the end of the day's business. However, the Court recognizes that it may not impose a kinder and gentler approach to the City's means of dealing with such conduct. Instead, this call is left to the democratic process.

the judicial function to solve the problem of homelessness or to question the legitimacy of local efforts to try to deal with this or any other social problem. Or, as Justice Black put it, "[o]f course, the desirability of this Texas statute [and here, the city ordinances] should be irrelevant in a court charged with the duty of interpretation rather than legislation, and that should be the end of the matter." *Powell,* 392 U.S. at 538, 88 S.Ct. at 2157 (Black, J., concurring).

Similarly, the City misunderstands the Court's comments, although the issue with which the City concerns itself may lead to the same result if the City wants to enforce the sleeping in public ordinance within constitutional bounds. Although as a matter of constitutional jurisprudence the City is not required to provide shelter or housing to anyone, the City is required to enforce its ordinances constitutionally. As noted above, as long as the homeless have no other place to be, they may not be prevented from sleeping in public. One way to remove the impediment to that ordinance's enforcement, though, would be for them to have some place to be other than in public. It seems that that situation would put one in the position of a Mr. Powell, who could be punished for conduct not inextricably intertwined in a status. But as long as homeless persons must live in public, their sleeping may not be constitutionally criminalized.

**6.** The Equal Protection Clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

**7.** Defendants assert that Plaintiffs argue "as applied" invalidity rather than facial invalidity and posit that "[t]his distinction is critical because it governs the legal analysis to be applied to Plaintiffs' claims." (Supp.Resp. at 2.) This appears to be the case, although this Court would say that it affects rather than governs the analysis. *See, e.g. Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979) (for one to prevail on equal protection challenge to facially gender-neutral statute challenged on basis of discriminatory effect, one must show discriminatory intent or purpose); *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264–66, 97 S.Ct. 555, 562–64, 50 L.Ed.2d 450 (1977) (same regarding race); *Crawford v. Board of Educ.,* 458 U.S. 527, 544,

III.

Plaintiffs also base their attack on the Equal Protection Clause,[6] which directs that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). However, the equal protection guarantee of the Fourteenth Amendment does not take all power of classification from the states. *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 271, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). As the Supreme Court has noted,

> [m]ost laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.

*Id.* at 271–72, 99 S.Ct. at 2292. An equal protection inquiry involves discerning the proper analysis from an evolved, three-tiered hierarchy of levels of scrutiny.[7] The quotation from *Feeney* above suggests the lowest tier, in which a court seeks merely the assurance that the classification under review bears some fair relationship to a legitimate public purpose. Put another way, this "most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause," *City of Dallas v. Stanglin,* 490 U.S. 19, 26, 109 S.Ct. 1591, 1596, 104 L.Ed.2d 18 (1989), which has

102 S.Ct. 3211, 3221, 73 L.Ed.2d 948 (1982) ("Under decisions of this Court, a law neutral on its face still may be unconstitutional if motivated by a discriminatory purpose"). The Court concludes that the ordinances at issue were enacted with the homeless particularly in mind. For instance, Assistant City Manager Levi Davis' testimony at the TRO hearing strongly suggested purposeful discriminatory enforcement of the sleeping in public ordinance. (TRO Transcript at 70–72). Additionally, the city resolutions attached to Plaintiffs' application specifically target the homeless. However, this conclusion does little more than bring one to the threshold of an equal protection analysis. It appears to be the case that if a facially neutral statute is unsupported by discriminatory intent, the analysis is over. However, if the state intends to classify—which as suggested above is not in itself unconstitutional—an interrogation of the statute under traditional equal protection analysis obtains.

also been termed the "general rule," mandates that "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Generally, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Rational-basis analysis "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," *Heller v. Doe*, —— U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (quoting *FCC v. Beach Communication, Inc.*, —— U.S. ——, —— – ——, 113 S.Ct. 2096, 2100–01, 124 L.Ed.2d 211 (1993)), nor does it authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Heller*, —— U.S. at ——, 113 S.Ct. at 2642 (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam)). In short, a classification must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. *Heller*, —— U.S. at ——, 113 S.Ct. at 2642.

■ The United States Court of Appeals for the Fifth Circuit has recently recapitulated the standards under which a court conducts the most exacting type of analysis in the equal protection context:

> If a classification disadvantages a "suspect class" or impinges upon a "fundamental right," the ordinance is subject to strict scrutiny. Under the strict scrutiny standard, we accord the classification no presumption of constitutionality. Instead, we ask whether the classification promotes a compelling governmental interest and, if so, whether the ordinance is narrowly tailored such that there are no less restrictive means available to effectuate the desired end.

*Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994). Classification based on race, alienage or national origin, which are considered suspect classes, gives rise to strict scrutiny. *Cleburne Living Ctr.*, 473 U.S. at 440, 105 S.Ct. at 3254. Rights are fundamental if they find their source, explicitly or implicitly, in the Constitution. *Ball v. Rapides Parish Police Jury*, 746 F.2d 1049, 1059 (5th Cir.1984). One such right is the right to travel among the states. *Id.*

■ The Supreme Court has also subjected other classifications to a mid-tier analysis—often termed "heightened" or "intermediate" review or scrutiny, *see Plyler*, 457 U.S. at 218 n. 16, 102 S.Ct. at 2395 n. 16, which focuses on whether a particular enactment is substantially related to a legitimate state interest. *Cleburne Living Ctr.*, 473 U.S. at 441, 105 S.Ct. at 3255. Such classifications as gender and illegitimacy, also known as quasi-suspect classes, necessitate review under intermediate analysis. For example, the Supreme Court has posited the rationale concluding the necessity for intermediate analysis as relates to gender in the following terms:

> Rather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women.

*Id.* In contrast, the Court has declined to accord heightened scrutiny to classifications based on, for example, age, *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), and mental retardation. *Cleburne Living Ctr.*, 473 U.S. at 442, 105 S.Ct. at 3255.

In choosing a level of scrutiny under which to view the challenged ordinances, the Court must undertake an examination of at least one, and depending on the answer to the first query, perhaps two questions: First, whether the challenged ordinances impinge on a fundamental right. If so, they are subject to strict scrutiny; if not, the presumption of constitutionality remains undisturbed thus far in the analysis, and the Court must secondly determine whether the ordinances im-

plicate a suspect or quasi-suspect classification, a determination that might supplant the presumption and subject the ordinances to strict or heightened scrutiny.

a.

■ Plaintiffs complain that the ordinances contravene their constitutionally guaranteed right to travel. The freedom to travel throughout the United States has long been recognized as a fundamental right secured by the Constitution. *Attorney Gen. of New York v. Soto–Lopez,* 476 U.S. 898, 901, 106 S.Ct. 2317, 2319–20, 90 L.Ed.2d 899 (1986). Although locating the textual source for the right has remained elusive, the Supreme Court has "not felt impelled to locate [it] definitively in any particular constitutional provision" given the "unquestioned historic acceptance of the principle of free interstate migration." *Id.* at 902, 106 S.Ct. at 2320. A state law may run afoul of the Constitution if it actually deters travel, if impeding travel is its primary objective, or if it uses any classification serving to penalize the exercise of the right to travel. *Id.* at 903, 106 S.Ct. at 2321. Plaintiffs allege that "by denying homeless persons a legal place to live and sleep, the purpose and effect of the Defendants' homeless policy is to deter homeless people from traveling or migrating to Dallas and to drive homeless people out of Dallas." (Compl. at ¶ 57.) [8]

The Supreme Court's right-to-travel jurisprudence typically has involved residency requirement statutes that treat one group more favorably than another for the purpose of bestowing certain benefits. For instance, in *Soto–Lopez* the Court invalidated a law giving a civil service employment preference, in the form of points added to test scores, to honorably discharged New York veterans who were New York residents at the time they entered military service. The Court recognized that

> New York's eligibility requirements for its civil service preference conditions a benefit on New York residence at a partic-

ular past time in an individual's life. It favors those veterans who were New York residents at a past fixed point over those who were not New York residents at the same point in their lives.

*Id.* at 905, 106 S.Ct. at 2322. The Court noted that the deprivation of veterans' credits was permanent because either one was or was not a New York resident at the time of entering military service and could therefore not earn a change in status, *id.* at 909, 106 S.Ct. at 2324, and concluded that "[s]uch a permanent deprivation of a significant benefit, based only on the fact of nonresidence at a past point in time, clearly operates to penalize appellees for exercising their rights to migrate." *Id.* Because New York failed to show that it had selected a means of pursuing a compelling state interest that did not impinge unnecessarily on the plaintiffs' constitutionally secured right, the law did not pass constitutional muster.

Similarly, in *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the Court considered laws that denied welfare assistance to residents of particular states and the District of Columbia who had not resided within the particular jurisdiction for at least one year immediately preceding the plaintiffs' applications for assistance. The Court concluded as follows:

> We do not doubt that the one-year waiting-period device is well suited to discourage the influx of poor families in need of assistance. An indigent who desires to migrate, resettle, find a new job, and start a new life will doubtless hesitate if he knows that he must risk making the move without the possibility of falling back on state welfare assistance during his first year of residence, when his need may be most acute. But the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible.

*Id.* at 629, 89 S.Ct. at 1328–29.

The facts of *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982)

---

8. Given the Court's conclusion set forth above concerning the sleeping in public ordinance, the Court need not consider that ordinance in relation to Plaintiffs' Fourteenth Amendment or right to travel challenge. This issue has been addressed elsewhere, though. *Cf.* Ades, *The Constitutionality of "Antihomeless" Laws: Ordinances*

*Prohibiting Sleeping in Outdoor Public Areas as a Violation of the Right to Travel,* 77 CAL.L.REV. 595 (1989) (for the viewpoint its title suggests), and *Joyce v. City & County of San Francisco,* 846 F.Supp. 843, 859 (N.D.Cal.1994) (refusing to recognize the "right to sleep" as a fundamental right).

involved the State of Alaska having established a fund into which the State deposited at least 25% of its mineral income each year. The State established a dividend program that distributed earnings from this fund directly to Alaska residents. Each adult resident received one dividend unit for each year of residency subsequent to 1959, the first year of Alaska's statehood. The plaintiffs, residents of Alaska since 1978, convinced the Supreme Court that the program violated the Equal Protection Clause. *Id.* at 65, 102 S.Ct. at 2315. Although not addressing the right to travel directly as in *Soto–Lopez,* the Court recognized that Alaska's dividend scheme was further problematic because of that right. The State advanced as a reason for the dividend program the creation of a financial incentive for individuals to establish and maintain a residence in Alaska. However, in answer to this assertion, the Court stated that

> newcomers seem more likely to become dissatisfied and to leave the State than well-established residents; it would thus seem that the State would give a larger, rather than a smaller, dividend to new residents if it wanted to discourage emigration. The separation of residents into classes hardly seems a likely way to persuade new Alaskans that the State welcomes them and wants them to stay.

> Of course, the State's objective of reducing population turnover cannot be interpreted as an attempt to inhibit migration into the State without encountering insurmountable constitutional difficulties. *See Shapiro v. Thompson,* 394 U.S., at 629, 89 S.Ct., at 1328.

*Zobel,* 457 U.S. at 62 n. 9, 102 S.Ct. at 2314 n. 9.

 Fairly considered, the facts of this case provide no correspondence between those characteristic of cases decided under right-to-travel precedent. Plaintiffs do not persuasively suggest that Defendants' enforcement of the ordinances at issue treats residents or immigrants any differently from nonresidents or those who might want to migrate to Dallas. If such laws as the aggressive panhandling ordinance or the closure ordinance deter anyone from traveling or migrating to Dallas, they do so in the same sense that anti-smoking ordinances or laws prohibiting the sale of alcohol in certain areas might deter smokers or drinkers from migrating to particular areas having such ordinances. The point is, any law might arguably affect one's determination to remain or to leave and thereby implicate constitutional difficulties under Plaintiffs' formulation. As the Fifth Circuit has recognized,

> If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue.

*Cramer v. Skinner,* 931 F.2d 1020, 1031 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991). Nor does Plaintiffs' allegation that the right to travel includes the right not to travel fare any better. To accept Plaintiffs' logic would be to find unconstitutional the removal of one who had migrated to the middle of the intersection at Main and Griffin streets during rush hour and then decided to exercise his constitutional right not to travel.

The facts of this case fit none of the three manners mentioned above in which a law might contravene the right to travel. There is no evidence that any of the remaining ordinances actually deter travel like the welfare assistance law in *Shapiro. See Soto–Lopez,* 476 U.S. at 903, 106 S.Ct. at 2321 (noting the law struck down in *Shapiro* as an example of an enactment that actually deterred travel). Nor is there any indication that the ordinances have as their primary objective the impeding of travel as did Alaska's dividend program in *Zobel. See Soto–Lopez,* 476 U.S. at 903, 106 S.Ct. at 2321 (giving *Zobel* as an example of legislation whose objective was the impeding of travel). Nor could the ordinances, by their very nature, penalize the exercise of the right to travel like the New York civil service preference as in *Soto–Lopez.* Simply put, it does not appear as though the ordinances under attack in this case implicate the right to travel.

In fact, the City's policy of dealing with the homeless would seem to have the exact opposite effect than what Plaintiffs fear. During the preliminary injunction hearing, testimony was elicited concerning the City's rental assistance program, a program designed to help homeless persons off the street by enabling them to obtain apartment housing. Had the City imposed a prior residence requirement like that in *Shapiro*, the effect would clearly have been to discourage the influx of new homeless persons seeking assistance. But the City suggested no such requirement. Instead, it appears to be the City's policy that the rental assistance program is available to all regardless of whether they have been on Dallas streets for any length of time or whether they heard of the program while living in Fort Worth or Denver or any other city and decided to migrate to Dallas for no other reason than to take advantage of the program. The Court concludes, then, that none of the ordinances at issue implicate the right to travel. Because none of the laws at issue impinge on a constitutionally secured fundamental right, the Court must determine whether they establish suspect or quasi-suspect classifications.

b.

■ The weight of authority, although not voluminous, is fairly uniform that the homeless do not constitute a suspect class, which would otherwise mandate strict scrutiny under equal protection analysis. *See Kreimer v. Bureau of Police*, 958 F.2d 1242, 1269 n. 36 (3d Cir.1992) (homeless do not constitute a suspect class for the purpose of equal protection analysis); *D'Aguanno v. Gallagher*, 827 F.Supp. 1558, 1563 (M.D.Fla. 1993) (same); *Salvation Army v. Department of Community Affairs*, 919 F.2d 183, 202 (3d Cir.1990) ("The proffered distinction ... [turns on] the 'poor and socially handicapped' nature of TSA's beneficiaries. Since this distinction does not implicate a suspect class, only rational basis scrutiny is required"); *Joyce*, 846 F.Supp. at 859 (applying rational basis analysis). A couple of courts have failed to reach the issue of whether homelessness is a suspect classification. *See Pottinger*, 810 F.Supp. at 1578; *Roulette v. City of Seattle*, 850 F.Supp. 1442, 1450 n. 9 (W.D.Wash.1994). On similar issues, the Supreme Court has declined to find suspect classifications. *Kadrmas v. Dickinson Public Sch.*, 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988) (wealth); *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (housing). Addressing abortion funding provisions under an equal protection attack, the Court stated the following:

> the principal impact of the Hyde Amendment falls on the indigent. But that fact does not itself render the funding restriction constitutionally invalid, for this Court has held repeatedly that poverty, standing alone, is not a suspect classification.

*Harris v. McRae*, 448 U.S. 297, 323, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). In light of this authority, the Court declines to subject the ordinances at issue to strict scrutiny based on homelessness being a suspect classification.

c.

■ The Court's next task is to determine whether homelessness is a quasi-suspect classification that might subject the ordinances to heightened scrutiny. On this issue, the Court takes guidance from a Fifth Circuit opinion and the Supreme Court's treatment of that opinion's analysis. In *Cleburne Living Center v. City of Cleburne*, 726 F.2d 191 (5th Cir.1984), *aff'd in part, vacated in part*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the circuit court faced an equal protection challenge to a city ordinance excluding group homes for mentally retarded persons from permitted uses in an "apartment house district." Although rejecting the notion that retardation was a suspect classification, the court determined that the ordinance's classification regarding the retarded warranted heightened scrutiny. *Id.* at 197. Several considerations informed the court's decision on this issue:

> Discrimination against the mentally retarded is likely to reflect deep-seated prejudice. They have been subjected to a history of unfair and often grotesque mistreatment. Until the 1970s, they were universally denied admittance into public schools in the United States. In addition, the Eugenic Society of America fought during the first half of this century to have

retarded persons eradicated entirely through euthanasia and compulsory sterilization. Euthanasia was rejected; but thirty-two states have had statutes providing for the sterilization of retarded individuals.

Mental retardates have been segregated into remote, stigmatizing institutions ... and when permitted in society, they have often been subject to ridicule. Once-technical terms for various degrees of retardation—e.g. "idiots," "imbeciles," "morons"—have become popular terms of derision.

*Id.* (citations omitted). The court further concluded that the mentally retarded have traditionally lacked political power and should be accorded special protection because their plight is immutable. *Id.* at 197–98.

On this part of the Fifth Circuit's opinion, though, the Supreme Court concluded otherwise. *City of Cleburne,* 473 U.S. at 442, 105 S.Ct. at 3255. Although recognizing that retarded persons have a "reduced ability to cope with and function in the everyday world," *id.,* and not disagreeing with the circuit court's characterization of the retarded as being traditional victims of discrimination, the Supreme Court made some other relevant observations:

> How this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary. Heightened scrutiny inevitably involves substantive judgments about legislative decisions, and we doubt that the predicate for such judicial oversight is present where the classification deals with mental retardation.

*Id.* at 442–43, 105 S.Ct. at 3256. Second, the Court concluded that a "distinctive legislative response" to the plight of the mentally retarded belied "a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary." *Id.* at 442, 443, 105 S.Ct. at 3256. Third, the Court noted that the legislative response, which could not have occurred without public support, contradicted the assertion that the mentally retarded were bereft of political influence, and fourth, the Court feared that if the

retarded were accorded quasi-suspect status, it would be "difficult to find a principled way to distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large." *Id.* at 445, 105 S.Ct. at 3257. As examples, the Court recognized the aging, the mentally ill and the infirm.

This Court discerns many correspondences between the case before it and the facts involved in the *City of Cleburne* cases. As the Fifth Circuit noted about the retarded, discrimination against the homeless is likely to be a function of deep-seated prejudice. *See, e.g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 161–62, 92 S.Ct. 839, 842–43, 31 L.Ed.2d 110 (1972) (charting the development of vagrancy laws); Harry Simon, *Towns Without Pity: A Constitutional and Historical Analysis of Official Efforts to Drive Homeless Persons from American Cities,* 66 Tul.L.Rev. 631, 635–45 (1992) (tracing the history of "official attempts to punish and control the displaced poor," noting that between the seventh and beginning of the twentieth century, more than two-hundred statutes against vagrancy existed in England); Robert Teir, *Maintaining Safety And Civility In Public Spaces: A Constitutional Approach To Aggressive Begging,* 54 La.L.Rev. 292–300 (1993) (chronicling anti-vagrancy and like laws from classical Athens to modern times). The homeless are also likely to be segregated because of their condition into "remote, stigmatizing institutions," *Cleburne Living Ctr.,* 726 F.2d at 197, like public shelters. Although one might conclude that the homeless lack political power though, the existence of lawsuits like this one belie that assertion. Such regional and national organizations like the National Law Center on Homelessness and Poverty, Food Not Bombs, the Coalition on Homelessness, and Independent Housing Services account for the homeless in the political arena.

The Fifth Circuit also noted that "if membership in the minority class is immutable, the Supreme Court is more likely to give the class special protection." *Id.* (citing *Parham*

*v. Hughes,* 441 U.S. 347, 351, 99 S.Ct. 1742, 1745–46, 60 L.Ed.2d 269 (1970)). However, unlike the retarded whose condition is permanent, the status of homeless individuals is not forever fixed. Although there certainly exist some whose condition is coupled with an immutable quality like retardation and some cases of mental illness, for the most part the plight of the homeless is ameliorable, hence the possibility of programs like San Francisco's Matrix Program, which, although including a law-enforcement component, encompasses a wide range of services to that city's homeless. *See Joyce,* 846 F.Supp. at 845. Another example might be Dallas' rent assistance program. Succinctly put, it appears to the Court that a comparison of the facts in this case to those the Fifth Circuit faced in *Cleburne Living Center* suggests that the Fifth Circuit, and later the Supreme Court, faced better, stronger facts arguing the recognition of quasi-suspect classification for the mentally retarded than this Court confronts concerning the homeless. The Supreme Court, though, determined that only rational-basis analysis should apply, and on the facts presented here, this Court concludes the same.

d.

 As outlined above, under rational-basis analysis, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. In other words, the Court asks merely the certainty that the classification under review bear some fair relationship to a legitimate public purpose. Defendants' reasons articulated at the preliminary injunction hearing for enactment of the ordinances at issue are basically twofold: public health concerns and public safety. For instance, in discussing the City's plans to build a homeless assistance center, an idea abandoned in favor of the rent assistance program, Defendant Luna, a member of the city council, testified concerning conditions prompting the City's interest in issues surrounding the homeless: "[T]here was recognition of living conditions under the bridge [that] were unacceptable and we had a provision to add portable toilets, running water, and trash dumpsters." (Tr. at 61.) Concerning the closure ordinance, Luna's testimony addressed public safety and crime issues:

When we were briefed by the Public Safety Committee about the crime in the downtown area, one-fourth to one-third of the crime was related to homelessness, as I mentioned either as the victim or the perpetrator. A tool that we have used in our parks, William Dean Park, Reverchon Park, where there is criminal activity after hours, is impose a curfew.

And we used that same model that we have used in our park system in this area because of the nature of crimes that were going on on these grounds.

(Tr. at 64). Assistant Chief of Police Marvin Bullard testified that statistics compiled by the police department indicate "that in and around the homeless encampment at I–45 and Taylor Street the likelihood of being a crime victim is 240 percent higher than it is in downtown Dallas." (Tr. at 110–11.) Concerning the solicitation by coercion ordinance, Luna testified as follows:

When we passed this ordinance two and a half years ago, the reason was to balance an individual's First Amendment rights. And there are a bunch of cases on begging, that an individual has the right to ask for money, but that right stops when the person that you're begging says no or when the form of begging comes in a threatening or violent or blocking manner.

So the Council passed this resolution to balance that First Amendment right to ask for money with a recognition that inappropriate and in fact illegal behavior would not be tolerated.

(Tr. at 73–74.)

The Fifth Circuit recently had the opportunity to address similar issues surrounding a "nocturnal juvenile curfew ordinance," coincidentally enacted by the City of Dallas, in *Qutb v. Strauss,* 11 F.3d 488 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994). The plaintiffs argued that the ordinance impinged on their "fundamental right" to move about freely in public, and the court assumed that there was a fundamental right as plaintiffs asserted

without deciding the issue, therefore subjecting the ordinance to strict scrutiny in an equal protection analysis. The court then marked the City's rationale for the enactment: "The articulated purpose of the curfew ... is to protect juveniles from harm and to reduce juvenile crime and violence occurring in the city." *Id.* at 493. The court concluded "that the state has demonstrated that the curfew ordinance furthers a compelling state interest, *i.e.,* protecting juveniles from crime on the streets. We further conclude that the ordinance is narrowly tailored to achieve this compelling state interest." *Id.* at 496 (footnote omitted).

The City's reasons for enacting the various ordinances at issue here are not greatly different from the safety concerns expressed in *Qutb.* The City concluded that the homeless—like juveniles—are more likely to be the victims as well as the perpetrators of criminal activity. Rationales underlying the other ordinances under attack, although not at issue in *Qutb,* are likewise at least rationally related to a legitimate state objective. As an impetus for enacting the garbage removal ordinance, the City determined that dumpster diving posed a health risk to the divers; other rationales include reducing the transmission of disease, insects and other health hazards as well as curbing littering. The City also concluded that, although one's constitutional right to express oneself by begging for money should be left undisturbed, another's corresponding right to be free from coercive, bellicose solicitation should also receive protection.[9] Of the state criminal trespass statute, this Court noted the following in its June 2, 1994 order:

> [O]thers have rights also. This includes the rights of a property owner to fairly control use of his property, which includes the rights of Government to control public property, as long as it is done so evenly

and fairly, and not in a[n unconstitutionally] discriminatory manner.

The Court views the City's articulated purpose for some of the ordinances as nearly identical with the rationales articulated and upheld *under strict scrutiny review* in *Qutb.* The Court can hardly maintain that the same rationale underpinning similar ordinances fails to survive rationale basis analysis here. Similarly, the Court concludes that Defendants have demonstrated a rational relation to a legitimate state interest regarding the ordinances supported by reasons other than those mirrored in *Qutb.* The Court therefore finds no equal protection infirmities in the City's ordinances.

## IV.

Next, Plaintiffs allege that the ordinances and statute violate the Due Process Clause because their enforcement acts against persons for "innocent and harmless acts" like "lying or sleeping on the ground covered by or on top of a blanket or cardboard carton." (App. TRO, at 33.) These allegations implicate the "substantive" component of the Due Process Clause, which protects individual liberty against certain governmental actions regardless of the fairness of the procedures used to implement them. *Collins v. City of Harker Heights,* —— U.S. ——, ——, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation and the right to bodily integrity. *Albright v. Oliver,* —— U.S. ——, ——, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994) (plurality). The Supreme Court has described substantive due process as having "scarce and open-ended" "guideposts." *Id.* at ——, 114 S.Ct. at 814.

---

**9.** Although Plaintiffs might complain that the projected effectiveness of the city ordinances to produce the sort of results that the City anticipates by its articulated rationales cannot fit well enough with the actual results, the Court finds the Fifth Circuit's commentary in *Qutb* on this issue instructive:

> [T]he plaintiffs['] arguments that the city has not produced proof of the effectiveness of the ordinance in addressing the juvenile crime

problem are unavailing; indeed, such "proof" can hardly amount to more than mere speculation. Federal courts have always been reluctant to question the potential effectiveness of legislative remedies designed to address societal problems. As we have held in other contexts, we "do not demand of legislatures scientifically certain criteria of legislation."

*Qutb,* 11 F.3d at 493 n. 7 (citation omitted).

Although Plaintiffs' argument might have some persuasiveness as relates to the sleeping in public ordinance, the Court concludes that their Due Process attack on that particular enactment need not be addressed in light of the Court's conclusion above under the Eighth Amendment. Concerning the rest of the challenged laws, it appears that their enactment and enforcement lie within the state's police power. Plaintiffs have failed to identify any suspect classification or fundamental right that the remaining ordinances and statute implicate; that being the case the due process analysis "result[s] in some sort of rationality review." *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir.1988). Governmental bodies have a wide latitude in enacting social and economic legislation. "[T]he federal courts do not sit as arbiters of the wisdom or utility of these laws." *Allright Colorado, Inc. v. City and County of Denver*, 937 F.2d 1502, 1512 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991). The Court's conclusions under the Equal Protection Clause that enforcement of the ordinances is rationally related to a legitimate state interest sounds the knell for Plaintiffs' substantive due process claim.

### V.

Plaintiffs' application for injunction, in shotgun fashion, also raises other issues:

The acts that Plaintiffs complain of are violations of the freedoms and rights guaranteed to the Plaintiffs and to each member of the class, under the United States Constitution, Amendments 1, 4, 5, 8, 9, and 14 and under the Constitution of the State of Texas, Bill of Rights Article 1, §§ 3, 9, 13, and 19.... All of said acts are in violation of 42 U.S.C. §§ 1983 and 1988.

(App. TRO, at ¶ 3.) However, the parties and amici spend the majority of their efforts on the issues discussed above. Other concerns that Plaintiffs mention in their application, like the First and Ninth Amendments, appear only in passing, and other than in the quotation above, find no place in the rest of Plaintiffs' materials. The Court therefore does not address those additional issues, except to note that there may be some overlap in analysis between certain federal constitutional provisions and their state counterparts. *See, e.g., Price v. City of Junction*, 711 F.2d 582, 590 (5th Cir.1983) (substantive & procedural due process rights granted by Art. I, § 19 of Texas Constitution are congruent with those of Federal Constitution); *Moore v. Port Arthur Indep. Sch. Dist.*, 751 F.Supp. 671, 673 (E.D.Tex.1990) (same); *Wilson v. State*, 825 S.W.2d 155, 162 (Tex.App.—Dallas 1992, pet. ref'd). To the extent of that overlap, those issues are necessarily decided by the analysis above.

**SO ORDERED.**

### APPENDIX

SEC. 18–51 RESTRICTIONS ON REMOVAL OF SOLID WASTE.

(a) A person commits an offense if he removes from any garbage container or receptacle any dry or wet solid waste, or in any way interferes with any garbage container or receptacle.

(b) It is a defense to prosecution under Subsection (a) of this section that the person was:

(1) an employee of the city in the performance of official duties;

(2) a licensee under this article performing solid waste collection service in compliance with the terms of this article and the solid waste collection license;

(3) any owner or occupant of the premises on which the container or receptacle is located.

SEC. 31–35. SOLICITATION BY COERCION

(a) In this section:

(1) SOLICITATION means to ask, beg, solicit, or plead, whether orally or in a written or printed manner, for the purpose of receiving alms, charity, or gifts of items of value for oneself or another person.

(2) COERCION means:

(A) to approach or speak to a person in such a manner as would cause a reasonable person to believe that the person is being threatened with:

(i) imminent bodily injury; or

(ii) the commission of a criminal act upon the person or another person, or upon property in the person's immediate possession;

(B) to persist in a solicitation after the person solicited has given a negative response;

(C) to block, either individually or as part of a group of persons, the passage of a solicited person; or

(D) to engage in conduct that would reasonably be construed as intended to compel or force a solicited person to accede to demands.

(b) A person commits an offense if he conducts solicitation by coercion.

## SEC. 31–37 HOURS OF CLOSURE FOR CERTAIN CITY PROPERTY

(b) The following city property [10] will be closed to the public each day from 12:00 midnight until 5:00 a.m.:

(1) the city hall plaza;

(2) the convention center grounds; and

(3) the central library grounds.

(c) A person commits an offense if he is on the premises of a city property designated in Subsection (b) during hours in which the property is closed.

(d) It is a defense to prosecution under Subsection (c) that the person was:

(1) attending or working at a special event, activity, convention, or program that was being conducted with city authorization on the city property or subsequently leaving the event, activity, convention, or program within a reasonable time after it had ended for the day;

(2) on the city property in accordance with the terms of a lease, rental agreement, contract, or other written permission from the city; or

(3) a city employee or a law enforcement officer in the performance of official duties.

## § 30.05 Criminal Trespass [11]

(a) A person commits an offense if he enters or remains on property or in a building of another without effective consent and he:

(1) had notice that the entry was forbidden; or

(2) received notice to depart but failed to do so.

---

10. Subsection (a) of the proposed ordinance specifically defines the actual geographic areas to be closed.

11. The remainder of the statute, which contains definitions not pertinent here, is omitted.